UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

GARTH HILL,

                 Petitioner,

   v.

                                      9:16-CV-1301
JOHN COLVIN,                           (MAD)

                 Respondent.

---

APPEARANCES:                         OF COUNSEL:

GARTH HILL
Petitioner, pro se
11-B-2398
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. ERIC T. SCHNEIDERMAN       ALYSON J. GILL, ESQ.
Attorney for Respondent              Ass't Attorney General
New York State Attorney General
120 Broadway
New York, New York 10271

MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

     Petitioner Garth Hill seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Dkt.

No. 1, Petition ("Pet.").[1]  Respondent opposes the petition.  Dkt. No. 15, Respondent's

---

[1] Petitioner's petition was transferred from the Western District of New York.  Dkt. No. 3.  Upon receipt of the petition, it was sealed, and the parties were directed to redact all documents filed and to be filed in the case which "tend[] to identify the victim(s) in this case, or move to seal the documents, if appropriate."  Dkt. No. 5 at 2 (citing N.D.N.Y.L.R. 8.1(2), (6)).  Respondent filed redacted copies of documents.  Given the nature of the underlying criminal conviction, no specific references will be made to either of the victims referenced in the sealed petition and attached state court records.

Answer; Dkt. No. 15-1, Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("R. Mem."); Dkt. No. 16, 16-1, State Court Records ("SCR"); Dkt. No. 16-2, Transcripts ("T.").[2]  Petitioner was advised that he could, but was not required to, file a reply.  Dkt. No. 18.  No reply was submitted.

　　For the reasons that follow, petitioner's habeas petition is denied and dismissed.

## II.    BACKGROUND

### A.    Arraignment

　　On January 3, 2011, petitioner was arraigned pursuant to a grand jury indictment.  T. 4-8; *see also* SCR 49-51 (Indictment).  The first count, burglary in the third degree (N.Y. Penal Law ("Penal Law") §140.20), alleged that on October 29, 2010, petitioner knowingly entered and unlawfully remained in McKinley Brighton School, with the intent to commit a crime therein.  SCR 49; T. 5.  The second count, sexual abuse in the first degree (Penal Law §130.65(1)), alleged that while inside the school, petitioner subjected a female victim to sexual contact by forcible compulsion.  SCR 49; T. 5.  The final two counts, forcible touching (Penal Law §130.52), contended that petitioner intentionally and illegitimately forcibly touched the sexual or intimate parts of two female victims for the purpose of degrading or abusing the victims or gratifying petitioner's sexual desires.  SCR 49, T. 5.  Petitioner pleaded not guilty. T. 6.

---

[2]  For ease of retrieval, citations to the various state court transcripts refer to the pagination generated by CM/ECF, the Court's electronic filing system, and not the pagination included on each individual transcript.

**B.    The Suppression Hearing**

Petitioner requested a *Wade/Huntley*[3] hearing: (1) seeking suppression of the victims' identification of petitioner; (2) claiming that the combination of a photographic array and live line-up was improper; (3) alleging the lineup was unduly suggestive, and (4) arguing petitioner's statements to the police were involuntarily made.  SCR 91-92.  Respondent opposed the motion.  SCR 93-95.  On April 29, 2011, a suppression hearing was held in the Onondaga County Court.  T. 42-65.

**1.    The People's Evidence**

On October 29, 2010, Detective Raul Santana, of the City of Syracuse Police Department's abused persons unit, was assigned to investigate claims that a man had sexually assaulted two teachers at McKinley Brighton school.  T. 49-51.  Upon arrival, Santana met with the responding officer, several staff members, and the two victims.  T. 51, 66.  Santana presented one of the victims with a photographic array[4], but the victim did not recognize anyone from the array.  T. 62-63; SR 155-56.  Similarly, the other victim also did not recognize anyone depicted in the photographic array when it was later presented to her

---

[3]  There are several types of suppression hearings available to criminal defendants depending on the type of evidence the defendant seeks to suppress.  Oftentimes, these hearings are combined for efficiency and preservation of resources.  "[A] hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), is held to determine the voluntariness of a criminal defendant's statements to the police." *Dearstyne v. Mazzuca*, 48 F. Supp. 3d 222, 227 n.4 (N.D.N.Y. 2011).  "[A] *Wade* hearing [usually] determine[s] if any of the identification procedures [were] . . . unduly suggestive." *Maldonado v. Burge*, 697 F. Supp. 2d 516, 521 (S.D.N.Y. 2010) (citing *United States v. Wade*, 388 U.S. 218, 232 (1967)).

[4]  The photographic array was created by Detective Jeff Bernozzi, also of the abused persons unit.  T. 107.  After identifying petitioner as a potential suspect from the identification found in the wallet left at the school, Bernozzi found petitioner's picture in a database, Live Scan, which catalogs booking photographs; however, the only photograph available was "an old one."  T. 107-108, 111.  Then, Bernozzi searched the Live Scan database using petitioner's height, weight, sex, and race and, from the search results, selected five other individuals with similar physical characteristics to petitioner and included them on the photographic array.  T. 107-108, 111-12.  The same six individuals were depicted in all three photographic arrays that were presented to the two victims and school principal; however, the order of the individuals was different in each array to preserve the array's integrity.  T. 108-109.

3

by Detective Jeff Bernozzi.[5]  T. 68-69, 109-10, 116-17; SR 162-63.

Santana was informed that the possible suspect had dropped his wallet, which contained identification, and a pack of cigarettes.  T. 52, 66-67.  The identification belonged to petitioner.  T. 52.  Santana discovered that petitioner was on parole and was reporting to his parole officer later that day; Santana spoke with petitioner during that meeting.  T. 52-53.  At that time, petitioner was presented with a form that explained his Constitutional rights.  T. 54; SCR 154.

Petitioner reported that he could read, so Santana asked him to read the first point on the form regarding petitioner's right to remain silent.  T. 54-56.  Petitioner attempted to read the line; however, his pace was slow and he sounded groggy, as if he was under the influence of drugs or alcohol.  T. 55-58, 86, 88-89.  Petitioner's parole officer conducted a drug screen and found that petitioner was under the influence of psychotropic drugs, specifically PCP.  T. 61, 86.

Despite his demeanor, petitioner indicated that he understood his right to remain silent, and every additional right that was thereafter communicated to him by Santana.  T. 58, 89.  Those rights included the right to an attorney (which could include appointed counsel) and the right to terminate the conversation and wait for an attorney to be present.  T. 59, 90-92.  Throughout the conversation, petitioner continually indicated his understanding (and memorialized it by placing his initials after each individual clause on the form); Santana perceived these representations to be genuine.  T. 59-60, 89-92.

---

[5] The same photographic array was also shown to the school's principal because one of the teacher victims had followed her assailant out of her classroom and toward the front door; the principal met both the victim and the perpetrator in the hallway and invited them into the principal's office to determine what happened and what should be done next.  T. 71-72.  The school's principal also reported not recognizing anyone in the array.  T. 72.

After the Constitutional rights form was read and signed, Santana and petitioner engaged in a limited discussion. T. 60. Santana testified that petitioner understood and answered the questions that followed in a manner that further solidified his belief that petitioner comprehended the conversations that were occurring. T. 94-96. Petitioner indicated that he did not have any identification on him, but did not answer where it might be. T. 60, 92-93. Petitioner admitted that he was at McKinley Brighton school; however, he never gave any reason for being there. T. 60, 93. At that time, petitioner asked for an attorney and all questioning ceased. T. 60, 94.

On February 9, 2011, petitioner participated in a court-ordered, live lineup at the Justice Center. T. 14-15, 63-64; *see also* SCR 1-5, 157-61 (pictures taken prior to and during the lineup). The procedure was on the record and petitioner's attorney, the prosecutor, and several law enforcement individuals attended. SCR 140-153, 164. The petitioner was the only individual that was common to both the photographic array and the live lineup. T. 78-79, 84.

The lineup consisted of six men. T. 77; SCR 142-43. A pool of potential "fillers" – the other individuals who would stand in the lineup with petitioner – were chosen independently by staff at the Justice Center; however, Detective Rory Gilhooley was able to make the final selection regarding which five additional individuals would be in the lineup. T. 77, 128, 142-44. Petitioner's attorney objected to the "fillers", specifically stating that none of them had "distinguishable marks on [their] neck[s]" like petitioner did; petitioner was the tallest person, in some instances by a sizeable amount, in the lineup; petitioner was placed in the center, next to men with starkly different complexions; and petitioner's face was shaped differently, specifically much rounder, than the other "fillers." SCR 140-41, 143. Petitioner's attorney

chose the position in which he stood – position number four – but Detective Gilhooley determined where to place the other five "fillers."  T. 79-80, 83, 129-30, 144; SCR 141.

Both victims attended the lineup, although they were always separated from one another.  T. 73-76, 119-21, 125-26; SCR 145-46.  Before the lineup commenced, both women were given identical instructions by Gilhooley, the detective who conducted the lineup.  T. 127, 133, 135; SCR 146-51, 166, 169.  They were informed that the men would file in, step forward, step back, and then the victim would be asked if she needed the process repeated or if she would like for any or all of the men to turn to the side.  T. 133-34, 136; SCR 146-51, 166, 171.  The victims were also told that they were free to move about and walk up and down the length of the one-sided glass to get a better look at the individuals within the lineup.  T. 80-81, 83-84; SCR 146, 149, 166, 171.  Both women stood stationary, before position number four, and identified petitioner as the man who assaulted them on October 29, 2010.[6]  T. 83-84, 134-36, 138, 147, 151-52, 166-73.

## 2.    Petitioner's Defense

The defense did not call any witnesses or present any evidence.  *See* SCR 45 (minutes from the Wade/Huntley hearing).

## 3.    The Court's Decision

On June 20, 2011, the court handed down its decision.  T. 162-176; *see also* SCR 53-66 (written Decision/Order dated June 17, 2011).  The findings of fact were consistent with the People's case.

Specifically, regarding the *Miranda* waiver, the court found

---

[6]  One of the victims was described as emotionally distraught when she saw petitioner.  T. 97.  While she "was composed [during the identification] . . . she was still visibly upset."  T. 98, *see also* T. 138-40.

> that despite the fact that [petitioner] appeared to be under the
> influence of drugs, he was able to understand the questions asked
> of him as evidenced by the appropriateness of his response.  After
> being advised of his rights, [petitioner] then waived his rights and
> agreed to speak with the police. [Petitioner] was asked if he had
> identification on him to which he replied that he did not. [Petitioner]
> indicated that he was in the area of McKinley Brighton school.
> [Petitioner] then stated he wanted to speak with his lawyer at which
> point all questioning . . . ceased.

SCR 55-56.  The court's findings of fact regarding the lineup were also consistent with the

testimony outlined above.  SCR 57-61.

The court denied petitioner's motion to suppress, finding that (1) there was nothing

improper with having a live lineup for the victims after they were both unable to identify

petitioner in a prior photo array; therefore, any related in court identification by said victims

was admissible and (2) petitioner was capable of understanding the Constitutional rights

contained in the *Miranda* form and knowingly, voluntarily, and intelligently waived said rights.

T. 163-64.  Specifically, the court relied upon the credible testimony from the officers to

determine that "the line up identification was not the result of undue suggestiveness even

though [petitioner] was the only person common to both the line up and photographic array."

SCR 62.  Citing to state law, the court held that "identification procedure[s are] not unduly

suggestive if the witness viewed a defendant in a line up after viewing that defendant's photo

in an array even if the witness was unable to make an identification from the photo array."

SCR 62 (citations omitted).  Thus, the fact of a subsequent identification procedure, alone,

was insufficient to require suppression.  Further, the court held that neither the array nor

lineup were unduly suggestive because both the "fillers" in the array and in the lineup were

"sufficiently similar to the [petitioner] in physical characteristics so that there would be no

substantial likelihood that the [petitioner] would be singled out for identification."  SCR 63

7

(citations omitted).  The court noted that such pretrial identification procedures have to be fair, not provide petitioner with "fillers who have identical physical characteristics."  SCR 64 (citations omitted).

With respect to petitioner's statements to Santana during his probation appointment, the court found petitioner "was fully and adequately advised of his constitutional rights prior to speaking with police . . . and . . . he knowingly, intelligently[,] and voluntarily waived his rights and agreed to speak with [the police]."  SCR 64.  The court held "although [petitioner] appeared to have been under the influence of drugs . . . [petitioner] was fully aware of his immediate circumstances and was fully able to comprehend the questions that were asked of him and was able to carry on an intelligent conversation with . . . Santana."  SCR 65. Petitioner was not so high as to be incapacitated.  SCR 65.  Additionally, the duration of the questioning was only forty-five minutes, not so long as to render petitioner's participation therein involuntary.  SCR 66.

A trial date was set for July 25, 2011. T. 164.

### C.    The Plea

On July 6, 2011, petitioner, represented by counsel, pled guilty to burglary in the third degree and sexual abuse in the first degree in exchange for an indeterminate prison term of two to four years for the burglary charge and twelve to life for the sexual abuse charge.  T. 167.  The court engaged in a long discussion explaining that, due to his two prior violent felony offenses, petitioner would be sentenced as a persistent violent felony offender.  T. 168-70.  The court had no discretion over petitioner's status, but, consistent with the plea offer, would sentence petitioner to the minimum end of the mandatory sentencing range.  T. 169.

8

The court then questioned petitioner. T. 170.  Petitioner acknowledged understanding the plea deal.  T. 170.  Petitioner also acknowledged that, by entering into a plea, he was giving up his right to a trial, which specifically included the right to have the state present its case and prove, beyond a reasonable doubt, that petitioner was guilty  T. 170-72.  This acknowledgment ultimately came after an off-the-record discussion between petitioner and his counsel.  T. 172.  Petitioner also expressed understanding of his continued right to remain silent and his wish to waive that right for the plea proceedings.  T. 172.

Petitioner denied consumption of any drugs or alcohol prior to his plea.  T. 172. Petitioner indicated that he fully understood the plea agreement and that he was entering into the agreement by his own free will, without threat, force, or coercion.  T. 173.  Petitioner then admitted that he "knowingly entered or remained unlawfully in . . . the McKinley Brighton School, with the intent to commit a crime therein," and pled guilty to the burglary charge.  T. 173.  Petitioner then admitted that he subjected one of the female victims "to sexual contact by forcible compulsion," and pled guilty to the sexual abuse charge.  T. 174.  The court accepted petitioner's plea.  T. 174.

### D.    The Sentencing Hearing

On July 27, 2011, the court sentenced petitioner on the aforementioned plea.  SCR 44-45; T. 177-87 (transcript of the hearing).  At the outset, the court discussed petitioner's criminal history and the conclusion that petitioner would be given persistent violent felony offender status; petitioner admitted to and did not contest the validity of his prior violent felony convictions.  T. 179.  Petitioner's counsel also reported that, based on his research, he did not feel that challenging the prior convictions would be successful.  T. 179.

The state then moved to sentence petitioner, arguing that petitioner should receive a life sentence because his actions violated the sanctity and safety of the school environment by "walk[ing] into a first grade classroom and . . . sexually assault[ing] a first grade teacher in front of her students." T. 180-81. Petitioner's counsel then argued for leniency stating that petitioner had a "very limited recollection of what occurred . . . [because] at the time th[e] incident occurred, he was under the influence of . . . Water . . . smoking with embalming fluid, which . . . creates a high." T. 181. Counsel went on to say that petitioner "underst[ood] that his use of [Water] d[id] not limit his legal responsibility . . . [and] he has accepted responsibility for his activity here." T. 181-82. Petitioner then addressed the court, "apologiz[ing] to the victims at McKinley-Brighton School," but expressing his displeasure with the mandatory sentencing guideline range. T. 182.

Prior to issuing its sentence, the court addressed petitioner's counsel's statements about petitioner's memory loss or inability to recall the events of that day. T. 162.

> [Y]ou may not remember what you did but the effect of what you did to the teachers involved and the young students who observed your actions on that day, they unfortunately will remember those actions forever. There is no doubt in my mind that your conduct in front of these first graders upset them. It created needless distress in their lives, it confused them and made them sad and afraid to go to school. . . . [I]n the violent society we live in, most young children view their schools as the last real safe haven . . . They look to their teachers for security and protection . . . you violated this safe haven . . . [a]nd sadly, one of the victims . . . , a teacher of ten years, will not return to the classroom. . . . The trauma of your actions in front of her first grade students has left this dedicated teacher unable to teach . . . [s]he has lost the confidence in her ability to protect a class of young students.

T. 183-84. The court then delivered its sentence, as previously indicated, for an indeterminate term of two to four years for the burglary charge and an indeterminate term of

10

twelve years to life for the sexual assault charge.  T. 185.

### E.    The Direct Appeal

In a counseled brief to the Appellate Division, Fourth Department, petitioner argued that (1) the lower court erred in denying suppression of identification evidence where the lineup was unduly suggestive; (2) the lower court erred by denying suppression of petitioner's statements because he was under the influence of drugs and the *Miranda* waiver was ineffective; and (3) the guilty plea must be vacated because it was not knowing, voluntary, and intelligent.  SCR 6-36.

In a decision dated March 27, 2015, the Fourth Department affirmed the guilty plea. *People v. Hill*, 126 A.D.3d 1538, 1539 (4th Dep't 2015); *see also* SCR 206-207.  First, the court rejected petitioner's argument that multiple pretrial identification procedures and the lineup were unduly suggestive.  *Hill*, 126 A.D.3d at 1539 (citations omitted).  The identification procedure was reasonable and "[a]lthough [petitioner] was taller than two of the fillers used in the lineup, the alleged variations in appearance between the fillers and the [petitioner] were not so substantial as to render the lineup impermissibly suggestive." *Id.* (internal quotation marks omitted) (citing cases).  Second, the court found that nothing in the record indicated that petitioner "was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements." *Id.* at 1539-40 (internal quotation marks omitted).  Last, the court held that petitioner "failed to preserve . . . his challenge to the voluntariness of his plea inasmuch as he failed to move to withdraw the plea or to vacate the judgment of conviction." *Id.* at 1540 (citing cases)

On April 14, 2015, in another counseled brief to the Court of Appeals, petitioner sought leave to appeal pursuant to Criminal Procedure Law § 460.20(3)(b) citing "novel and important issue[s] pertaining to successive identification procedures." SR 211-16. The People opposed the request. SCR 217. On June 30, 2015, the Court of Appeals denied petitioner's motion. *Hill*, 126 A.D.3d 1538, *lv. denied* 25 N.Y.3d 1165 (2015); *see also* SCR 208.

## III.    THE PRESENT PETITION

Petitioner seeks habeas relief on the following grounds: (1) the lower court erred when it denied petitioner's motion to suppress identification evidence; (2) the lower court erred when it denied petitioner's motion to suppress his statements to police; (3) petitioner's guilty plea was not knowing, intelligent, and voluntary; and (4) counsel was ineffective for failing to file a motion to withdraw petitioner's plea. Pet. at 6-10.

## IV.    DISCUSSION

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465,

473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779).  A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).  "A state court decision is based on a

clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).  Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]"  *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

### B.    Unduly Suggestive Identification Procedures

Because petitioner's identification claims have been fully adjudicated on the merits in state court, the AEDPA standard applies.  Petitioner asserts that because of the timing and composition of the court-ordered line up, it was unduly suggestive.  In this case, the state court decision was not a contrary application of clearly established federal law.

"The aim . . . of due process is . . . to prevent fundamental unfairness in the use of evidence [at trial] . . . ."  *Lisenba v. California*, 314 U.S. 219, 236 (1941).  Thus, constitutional protections are triggered when identification procedures are at issue because any "likelihood of misidentification . . . violates a defendant's right to due process . . . ."  *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) ("[R]eliability [of the identification] is the linchpin in determining the admissibility of [the] identification testimony . . . .").

In order to evaluate the constitutionality of an identification procedure, the Second Circuit has implemented a two-step test based on Supreme Court precedent.  *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001).

> The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator. . . . If the procedures were not suggestive, the

14

> identification evidence presents no due process obstacle to
> admissibility, *see, e.g., Jarrett v. Headley*, 802 F.2d 34, 42 (2d
> Cir.1986); no further inquiry by the court is required, and the
> reliability of properly admitted eyewitness identification, like the
> credibility of the other parts of the prosecution's case is a matter for
> the jury, *Foster v. California*, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127,
> 22 L.Ed.2d 402 (1969). If the court finds, however, that the
> procedures were suggestive, it must then determine whether the
> identification was nonetheless independently reliable. . . In sum, the
> identification evidence will be admissible if (a) the procedures were
> not suggestive or (b) the identification has independent reliability.
> *See, e.g., Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243;
> *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401
> (1972); *United States v. Salameh*, 152 F.3d 88, 126 (2d Cir.1998),
> *cert. denied*, 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999).

*Raheem*, 257 F.3d at 133 (internal quotation marks omitted); *see also Moore v. Illinois*, 434

U.S. 220, 227 (1977) (explaining the first step of the two-step test whereby "due process

protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial

identifications obtained through unnecessarily suggestive procedures.") (citing cases).

When evaluating the first step – whether an identification procedure was unnecessarily

suggestive – a court must evaluate "the totality of the circumstances." *See, e.g., Manson v.

Brathwaite,* 432 U.S. 98, 110-113 (1977) (citations omitted).  "[W]hether an identification

procedure violates due process . . . hews closely to the facts of a particular case and turns on

a court's judgment in evaluating those facts." *Brisco v. Ercole*, 565 F.3d 80, 90 (2d Cir. 2009)

(citations omitted).  Thus, this gives rise to a "fact-dependent standard demand[ing] a

substantial element of judgment . . . [; accordingly, a] court applying this standard . . . is . . .

entitled to significant leeway when . . . review[ing a] decision for reasonableness." *Id.*

(internal quotations and citation marks omitted).  "A lineup is unduly suggestive as to a given

defendant if he meets the description of the perpetrator previously given by the witness and

the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134; *see also Jarrett v.*

*Headley*, 802 F.2d 34, 41 (2d Cir. 1986) ("[T]he principal question is whether the picture of

the accused, matching descriptions given by the witness, so stood out from all of the other

photographs as to suggest to an identifying witness that that person was more likely to be the

culprit.") (internal quotation marks and citations omitted).    However, "[p]olice stations are not

theatrical casting offices; a reasonable effort to harmonize the lineup is normally all that is

required." *Roldan v. Artuz*, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) (internal quotation

marks and citations omitted); *see also United States v. Reid*, 517 F.2d 953, 965 n.15 (2d Cir.

1975) (explaining " there is no requirement that even in lineups the accused must be

surrounded by persons nearly identical in appearance, however desirable that may be.").

Here, for the reasons discussed below, the state court reasonably applied clearly

established federal law in determining that the pretrial identification procedures were not

unduly suggestive.  Because the procedures were not unduly suggestive, no further inquiry

into the reliability of the procedures is required.  *Raheem*, 257 F.3d at 134.

### 1.    Two Pretrial Identification Procedures

Petitioner first claims that the pretrial identification procedures were unduly suggestive

because the victims viewed both a photo array and a lineup in which he was the only

individual common to both.  Further, liberally construing petitioner's allegations, petitioner

also contends that the protracted temporal proximity between the identification procedures

rendered them unconstitutional.  The trial court and Appellate Division both rejected this

claim.  Specifically, the trial court noted that (1) a successive identification procedure

following a photo array where no defendant was identified was not *per se* unduly suggestive

and (2) a gap of three and a half months between the identification procedures was not so

long as to invite a possibility of irreparable misidentification.  SCR 63.  The Appellate Division

16

cited New York precedent that "[i]t is well settled that multiple pretrial identification procedures are not inherently suggestive . . . ."  *Hill*, 126 A.D.3d at 748 (internal quotation marks and citations omitted).  The Second Circuit has reached the same conclusion.  *See McKinnon v. Superintendent*, 422 F. Appx. 69, 74 (2d Cir. 2011) (" Successive identification procedures are not *per se* unduly suggestive, even where the accused is the only common denominator among them."); *United States v. Conception*, 983 F.2d 369, 379 (2d Cir. 1992) (holding subsequent identification procedures were not unduly suggestive where " a suspect's picture was placed in a second [photo] array after a witness has failed to select any from the first array . . . .").

Here, the state court applied clearly established federal law and reasonably determined that having two identification procedures, in and of itself, was insufficient to render the procedures unduly suggestive.  *McKinnon*, 422 F. Appx. at 74.  This is so even if the victim failed to identify anyone in the first array or petitioner is the only common denominator between the two identification proceedings.  *Conception*, 983 F.2d at 379.  Further, the trial court reasonably held that though the two procedures occurred several months apart, that time period is not so long to be deemed a source of irreparable misidentification.  *See Simmons*, 390 U.S. at 382-83 (dismissing claims of an unduly prejudicial identification procedure whereby petitioner was identified first in a photo array the day after the crime was committed and then identified again, in-court, during the course of his trial which concluded almost a year later);[7] *Parham v. Griffin*, 86 F. Supp. 3d 161, 171

---

[7] The underlying trial court decision was consulted for the specific day: the crime occurred, the pretrial identifications occurred, the trial began, and the decision was entered.  *United States v. Garrrett*, 371 F.2d 296, 297 (7th Cir. 1966)

(E.D.N.Y. 2015) ("Federal courts have found identifications reliable where there were seven months between the crime and the confrontation . . . .").

### 2.   Composition of Lineup

Petitioner next claims that the composition of the lineup was unduly suggestive because he was placed next to a shorter, Hispanic man with a different complexion.  Pet. at 8-9.  The trial court considered the testimony, viewed the lineup photographs, and watched the video of the lineup; it then held that the lineup was not unduly suggestive because "the fillers were sufficiently similar to the defendant in physical characteristics so that there would be no substantial likelihood that the defendant would be singled out for identification."  SCR 63.  Further, the Fourth Department found the lineup procedures reasonable and held that the "defendant failed to . . . establish[] that the lineup was unduly suggestive . . . Although defendant was taller than two of the fillers used in the lineup, the alleged variations in appearance between the fillers and the defendant were not so substantial as to render the lineup impermissibly suggestive."  *Hill*, 126 A.D.3d at 1539 (internal quotation marks and citations omitted).

Here, the trial court determined the facts and ultimately held that the lineup participants were of sufficiently similar stature and complexion so that petitioner would not be singled out for identification.  The Appellate Court agreed, stating that even with a slight height disparity between the five fillers, there were no substantial differences sufficient to render the lineup impermissibly suggestive.  These factual findings are entitled to a great deal of deference.  *Brisco*, 565 F.3d at 90.  Further, they are entitled to a presumption of correctness that may only be rebutted with clear and convincing evidence.  *See* 28 U.S.C. §2254(g)(1).  No such evidence has been produced to disturb such findings.  Upon

18

independent review of the photographs from the lineup, the Court finds the factual determinations made by the state courts, as well as their conclusions, reasonable in light of the evidence presented.

Further, the standard by which the state courts evaluated the evidence, ensuring that there was no undue suggestion or substantial likelihood for misidentification, represents an appropriate and reasonable application of clearly established federal law. *Raheem*, 257 F.3d at 133. The constitution does not guarantee that petitioner would be placed "in a lineup with other individuals nearly identical in appearance to himself . . . [instead it provides for] fill-ins . . . sufficiently similar in appearance to petitioner such that the victims were not oriented toward selecting only [petitioner] as a participant in the crimes charged . . . ." *Collins v. Scully*, 878 F. Supp. 452, 456-57 (E.D.N.Y. 1995) (citations omitted). The "filler" individuals in the lineup were chosen based on similar physical characteristics between themselves and petitioner.[8] As determined by the trial and appellate courts, and independently corroborated by the Court's review of the record, petitioner's appearance was substantially similar to the "fillers" and not so uniquely distinctive that it would render petitioner the only likely choice for the victims to pick.

For the reasons previously discussed, the state courts' evaluation of petitioner's claims was consistent with clearly established federal law, and habeas relief is unwarranted.

### 3. Position of the Victims During the Lineup

Finally, petitioner contends that the lineup was suggestive because the victims were

---

[8] Unlike other cases – where a victim or witness's description of what the perpetrator was wearing or looked like composed a large portion of the court's analysis – here there was little to no emphasis on petitioner's reported physical description. Rather, petitioner was identified by the identification found within the wallet that was left at the school.

both standing in front of position number four when they viewed the lineup, which was the position in which petitioner stood. The trial court did not specifically address this issue, but generally concluded that "there were no irregularities in the conduct of the line up that would cause a risk of creating an unduly suggestive procedure." SCR 63. Similarly, the Appellate Division found that respondent "established the reasonableness of the lineup identification procedure, and defendant failed to meet his ultimate burden of establishing the lineup was unduly suggestive." *Hill*, 126 A.D.3d at 1539. These factual determinations regarding the line-up procedure are presumed to be correct, unless petitioner overcomes that presumption by clear and convincing evidence. 28 U.S.C. §2254(e)(1). No such evidence has been presented here.

The standard by which the state courts evaluated the evidence, ensuring that the identification procedures were not unduly suggestive, represents an appropriate and reasonable application of clearly established federal law. *Raheem*, 257 F.3d at 133. This application and conclusion is also reasonable given the facts that both victims were given identical instructions, which included the ability to stand and move wherever they needed to during the course of the lineup, and petitioner's counsel had the choice to place him wherever she wanted in the lineup.

For the reasons stated above, petitioner's claims about the identification procedures employed do not entitle him to habeas relief; thus, they are denied and dismissed.

### C.    Waiver of *Miranda* Rights

Petitioner contends that his *Miranda* waiver was not knowing and voluntary because he was suffering the effects of PCP and could not independently read the warnings on the *Miranda* form. The state courts both rejected petitioner's contentions.

Alleged *Miranda* violations implicate a petitioner's Fifth Amendment rights against self incrimination and Fourteenth Amendment rights to due process. *Withrow v. Williams*, 507 US. 680, 688 (1993). Thus, law enforcement is subject to

> an obligation to follow certain procedures in their dealings with the accused[; specifically,] prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to have counsel present if he so desires.

*Moran v. Burbine*, 475 U.S. 412, 420 (1986) (internal quotation marks omitted) (citing *Miranda v. Arizona*, 348 U.S. 436, 468-70 (1966)). To determine whether a waiver is effective, courts employ a "totality of the circumstances [inquiry] . . . to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979) (citing *Miranda*, 348 U.S. at 475-77); *see also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam) (citing *Moran*, 475 U.S. at 421 (holding that the respondent "must show (1) that the relinquishment of the [petitioner's] rights was voluntary, and (2) that the [petitioner] had a full awareness of the right being waived and of the consequences of waiving that right"). Factors to be considered include: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988). "'[K]nowing' means with full awareness of the nature of the right being abandoned and the consequence of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011), *cert. denied*, 565 U.S. 1230 (2012)).

"An individual's mental state should be considered in the voluntariness inquiry . . . [as]

a person [who] is . . . drugged or otherwise lacks capacity for conscious choice," cannot

voluntarily waive his or her rights. *Taylor*, 745 F.3d at 24. However, the fact that an

individual has ingested drugs or alcohol does not render his or her waiver *per se* involuntary;

the relevant inquiry is whether the individual was able to exercise deliberate, conscious

choice. *Scott v. Fisher*, 652 F. Supp. 2d 380, 431 (W.D.N.Y. 2009) (citing cases).

 The trial court found Santana's testimony credible, namely that he met with petitioner,

provided him with the waiver form, ultimately read it for petitioner, asked petitioner if he

understood it, and had petitioner sign the form after petitioner indicated he did. SCR 64-65.

Santana engaged petitioner in a conversation and said "he appeared coherent although he

was clearly under the influence of drugs or alcohol." SCR 65. Santana also testified that

given petitioner's responses to his questions, petitioner "was fully aware of his immediate

circumstances and was fully able to comprehend the questions that were asked of him . . . ."

SCR 65. The court ultimately held that "[t]he evidence does not support a finding that the

defendant was so high . . . that he was incapable for intelligently waiving his rights . . . ."

SCR 65. Similarly, the Fourth Department rejected petitioner's claims "as there [wa]s no

evidence that [petitioner] was intoxicated to the degree of mania, or of being unable to

understand the meaning of his statements." *Hill*, 126 A.D.3d at 1539 (internal quotation

marks and citations omitted).

The state court found Santana's testimony credible – a finding of fact that is subject to a presumption of correctness. 28 U.S.C. §2254(e)(1). Petitioner has not offered any clear and convincing evidence to rebut that presumption. Thus, re-evaluating the credibility determinations of the state court, absent clear and convincing evidence, is inappropriate. *Id.*

The state courts' focus on petitioner's ability to comprehend Santana's questions and intelligently make decisions about speaking or remaining silent is neither contrary to nor an unreasonable application of Supreme Court precedent. Petitioner maintains that he was too intoxicated to properly understand and waive his *Miranda* rights; however, the record fails to support those conclusions. Petitioner's drug use is not disputed. All parties agree that he was acting differently due to the influence of PCP in his system; however, that fact alone is insufficient to render petitioner's waiver ineffective. *Fisher*, 652 F. Supp. 2d at 431. The court found, pursuant to Santana's credible testimony, that petitioner understood the rights he was waiving and the subsequent questions that were being asked of him. Based upon the record evidence, the Court cannot conclude that these factual determinations were unreasonable. While petitioner was too groggy to read the form himself, he was able to acknowledge and express his understanding of each clause of the form as it was read to him, as well as memorialize that understanding with his signature. Petitioner's actions demonstrated that he was fully aware of what was happening; When the questions sought more incriminating information, petitioner neglected to answer them and, ultimately, asked for counsel, terminating the conversation. As the state court found, these facts demonstrate a willful, competent, and coherent set of actions by petitioner. Further, the record fails to indicate any type of threat or coercion. Petitioner's decisions and resulting actions during this conversation with Santana do not support his contentions that he was too impaired to

23

understand what was happening or properly waive his rights to remain silent or request counsel.

In sum, the state courts viewed petitioner's claims in light of the totality of the circumstances and found that petitioner's *Miranda* waiver was knowing and voluntary. That conclusion was neither contrary to, nor unreasonable application of, clearly established Supreme Court precedent. Therefore, petitioner's claim is denied and dismissed.

### D.    Voluntariness of Plea

Petitioner contends that his plea was involuntary and unknowing because the court did not further examine a possible intoxication defense. For the reasons that follow, petitioner's claim is unexhausted, procedurally defaulted, and plainly meritless.

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254 (b)(1)(A), (B)(i), (ii). "The exhaustion requirement 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings[.]'" *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations

omitted); *Fama v. Comm'r. of Corr. Servs.*, 235 F.3d 804, 808 (2d Cir. 2000).  In other words, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  The petitioner must have used the proper procedural vehicle so that the state court may pass on the merits of his or her claims.  *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985); *Barton v. Fillion*, No. 9:03-CV-1377 (DNH/GJD), 2007 WL 3008167, at *5 (N.D.N.Y. Oct. 10, 2007).  "[W]hen a 'petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted."  *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman v. Thompson*, 510 U.S. 722, 735 n.1 (1991).

Regardless of the claim, a federal court is precluded from issuing a writ of habeas corpus if an adequate and independent state-law ground justifies the petitioner's detention. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977).  Accordingly, "[f]ederal courts generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (citing *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).  This results in a state-law procedural default.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  This analysis applies with equal force "whether the independent state law ground is substantive or procedural . . . ."  *Garvey*, 485 F.3d at 713 (citing *Lee*, 534 U.S. at 375).  Pursuant to this analysis, a state law ground is generally adequate where "it is firmly established and regularly followed in the state;" however, "in certain limited

circumstances, even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule . . . [wa]s exorbitant." *Id.* at 713-14 (internal quotation marks omitted) (citing *Lee*, 534 at 376). Exorbitant application of a generally sound rule requires consideration of:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee*, 534 at 381-85).

Petitioner's claim is procedurally defaulted for two reasons. First, this claim is unexhausted with no further avenue for redress available in state court. Petitioner raised the claim to vacate his guilty plea on direct appeal (SCR 7, 30-35); however, he never sought leave to appeal to the New York Court of Appeals on that ground (SCR 211-216). Therefore, the claim is unexhausted because it did not travel through one entire round of the state court appellate process. *O'Sullivan*, 526 U.S. at 845. Further, it is procedurally defaulted because he can no longer raise it in any state forum. Petitioner already utilized the direct appeal to which he is entitled and, because the claim was reviewable from the record, he cannot raise it in a motion to vacate the judgment. *See Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991) (explaining that where "the one request for leave to appeal" was taken and additional collateral review would be barred because the issues could have been raised on direct appeal, "petitioner no longer has 'remedies available' in the . . . state courts . . . and . . . he had met the statutory exhaustion requirements . . .").

26

Second, as held by the Appellate Division, petitioner's claim was barred from review because it was unpreserved. *Hill,* 126 A.D.3d at 1540 ("Finally, [petitioner] failed to preserve for our review his challenge to the voluntariness of his plea inasmuch as he failed to move to withdraw the plea or to vacate the judgment of conviction.").

> New York courts routinely and regularly require defendants to make a motion . . . to withdraw their guilty plea or to vacate the judgment in order to preserve for appeal any claim relating to the validity of the plea itself . . . the Appellate Division's reliance on the state procedural rule . . . constitutes both an 'adequate' and 'independent' ground for its decision.

*Snitzel v. Murry,* 371 F. Supp. 2d 295, 301 (W.D.N.Y. 2004) (citing cases); *see also Irvis v. Haggat,* No. 9:12-CV-1538 (FJS/TWD), 2015 WL 6737031, at *8-9 (N.D.N.Y. Nov. 3, 2015) ("Habeas courts in this Circuit have recognized that failure to move to withdraw a guilty plea or move to vacate a judgment of conviction constitutes an independent and adequate state procedural rule barring federal habeas review of claims challenging the voluntariness of a plea . . . .") (citing cases).  Therefore, this represents an independent and adequate state rule resulting in a procedural default of petitioner's claims.

Procedurally defaulted claims are not subject to habeas review unless a petitioner shows cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice, i.e., that he or she is actually innocent. *House v. Bell,* 547 U.S. 518, 536-39 (2006); *Schlup v. Delo,* 513 U.S. 298, 327 (1995); *Jackson v. Conway,* 763 F.3d 115, 133 (2d Cir. 2014); *see Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir. 2002) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.") (quoting *Bousley v. United States,* 523 U.S. 614, 623 (1998)).  To establish cause, petitioner must show that some objective external factor impeded his ability to comply

27

with the relevant procedural rule. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman*, 501 U.S. at 753. If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Here, petitioner has neither alleged nor does the record support any contentions of cause or actual innocence. Because cause has not been established, no discussion of prejudice is necessary. Thus there is nothing that can save petitioner's procedurally defaulted claim: habeas review is precluded.

In addition to the procedural reasons to deny review, the claim is also without merit. "The Due Process Clause . . . requires an affirmative showing that a defendant's plea is entered both knowingly and voluntarily before the trial court may accept the plea." *Ferrer v. Superintendent*, 628 F. Supp. 2d 294, 304 (N.D.N.Y. 2008) (citing *inter alia Godinez v. Moran*, 509 U.S. 389, 400 (1993)). "On collateral review, a court may only vacate a guilty plea where the petitioner can establish that the plea was not made knowingly and voluntarily." *Id.* (citations omitted). Further, statements made by a defendant at a plea hearing constitute a "formidable barrier" that cannot be easily overcome in subsequent collateral proceedings because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The statements, under oath, which petitioner made during the course of his counseled plea allocution indicate a knowing and voluntary plea. First, petitioner was counseled at the plea and took the opportunity to confer with his representative just prior to pleading guilty.

Second, being under oath, such statements are entitled to deference.  Third, petitioner engaged in a lengthy colloquy with the court whereby he (1) acknowledged understanding the plea agreement; (2) acknowledged and accepted the waiver of his right to a trial and right to remain silent; (3) indicated that he was entering into the agreement voluntarily, without threat, force, or coercion; and (4) admitted that he entered McKinley Brighton School and subjected the female victims to sexual contact.   All of these factors demonstrate that the Appellate Division's decision was neither contrary to nor an unreasonable application of Supreme Court precedent or unreasonably determined given the facts.

Petitioner's only contention to rebut his testimony's presumption of validity is his argument that his plea was involuntary and unknowing because the court did not further examine a possible intoxication defense.  This claim is also plainly meritless.  Petitioner first discussed his inability to recall the events surrounding the sexual assaults during his sentencing hearing; he contended he was too high to remember most of the crime.  However, this discussion happened after petitioner had already engaged in a long colloquy with the judge, made statements on the record, conferred with his counsel, and ultimately pled guilty to several crimes.  Rebutting the presumption of validity that accompanies these admissions, which occurred under oath and while petitioner was sober, cannot easily be accomplished. *Blackledge*, 431 U.S. at 74.  Petitioner has offered nothing substantial enough to overturn that presumption now.

Therefore, petitioner's habeas petition is denied.

### F.    Ineffective Assistance of Counsel

Petitioner claims that counsel was ineffective for failing to withdraw his guilty plea. Liberally construing this claim, it appears that petitioner is arguing that counsel's advice to

plead guilty amounted to ineffective assistance of counsel. Petitioner's claim is unexhausted and, in any event, plainly meritless.

Petitioner's ineffective assistance of counsel claim is unexhausted. To date, petitioner has failed to present his ineffective assistance of counsel claim to any state court. "[W]hen a 'petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citations omitted). However, petitioner's claim is not barred because he can still assert it in a post-conviction motion in state court. *See* N.Y. Criminal Procedure Law § 440.10(2)(c); *see also Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) (citations omitted).

This Court could stay the petition and allow petitioner to return to state court to satisfy the exhaustion requirement; however, the Supreme Court has held it an abuse of discretion to stay a mixed petition where there was no "good cause [shown] for petitioner's failure to exhaust his claims first in state court . . . [or where petitioner's] unexhausted claims are plainly meritless." *Rhines v. Weber,* 544 U.S. 269, 277 (2005). Petitioner has not requested a stay or provided any reasons why he did not seek relief on his claim. Despite petitioner's failure to exhaust, the Court can still deny the claim on the merits and with prejudice. *Rhines,* 544 U.S. at 277 (citing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Accordingly, for the reasons provided below, petitioner's claim is dismissed.

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different, and as a result, petitioner suffered prejudice. *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The standard "must be applied with scrupulous care" in habeas proceedings, because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial] proceedings[.]" *Premo*, 562 U.S. at 122. "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (quoting *Strickland*, 466 U.S. at 687) (internal quotation marks and further citation omitted). A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Even if petitioner can establish that counsel was deficient, he still must show that he suffered prejudice. *Id.* at 693-94.

The *Strickland* test applies "to challenges to guilty pleas based on ineffective assistance of counsel." *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). To establish prejudice in this instance, petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "[W]here the alleged error . . . is a failure to advise the defendant of a potential affirmative defense to the crime charged, . . . 'prejudice' . . . will depend largely on whether the affirmative defense likely

would have succeeded at trial."  *Id.* (citing *Evans v. Meyer*, 742 F.2d 371, 375 (7th Cir. 1984)

("It is inconceivable . . . that Evans would have gone to trial on a defense of intoxication, or

that if he had done so he either would have been acquitted or . . . have been given a shorter

sentence than he actually received.")); *see also Panuccio v. Kelly*, 927 F.2d 106, 109 (2d Cir.

1991) ("The likelihood that an affirmative defense will be successful . . . and an assessment

of the probable increase or reduction in sentence relative to the plea if the defendant

proceeds to trial are clearly relevant to the determination of whether an attorney acted

competently in recommending a plea.").

"[I]ntoxication is not actually a complete affirmative defense to a criminal charge; it

rather merely reduces the gravity of the offense by negating the specific intent element of the

crime charged."  *Garfield v. Poole*, 421 F. Supp. 2d 608, 612 (W.D.N.Y. 2006).  The threshold

to negate intent is "quite high" and "even an intoxicated person may be capable of forming

the requisite intent."  *Id.*  Accordingly, counsel has no duty to disclose an intoxication defense

where the likelihood of success is slim and the risk of increased exposure to punishment is

significant.  *Panuccio*, 927 F.2d at 109.

Here, petitioner cannot establish either prong of the *Strickland* test: there is nothing in

the record to support the conclusion that counsel's performance was objectively

unreasonable or incompetent or that petitioner was prejudiced by the plea.  Counsel

represented petitioner at the suppression hearing, cross-examining witnesses and objecting

to testimony.  The testimony during the hearing established that petitioner was at the school,

as his discarded wallet with his identification was found in the hallway and he later admitted

he had been there.  Additionally, he was high on the day of the incident, though the testimony

also established that, despite his intoxication, petitioner was able to comprehend the

questions he was being asked by law enforcement and was aware when he should stop talking because he was beginning to provide inculpatory information.  Testimony from the hearing also established that both victims identified petitioner as their assailant after an in-person line-up at the jail.  After the hearing, the court held that both victims' identifications of petitioner would be admissible.  These factual findings are entitled to a presumption of correctness that may only be rebutted with clear and convincing evidence.  *See* 28 U.S.C. §2254(g)(1).  No such evidence has been produced to disturb such findings.

There is nothing in the record to establish that petitioner could establish a viable intoxication defense.  Further, knowing that both victims would testify that petitioner sexually assaulted them in an elementary school – one assault happening in front of several first graders in their classroom – would alert any defendant and his counsel to the fact that the trial would be punctuated with inflammatory and incriminating evidence which would be difficult to diffuse.  It is unclear whether counsel and petitioner ever discussed an intoxication defense; however, the likelihood that an affirmative defense of intoxication would trump the aforementioned evidence is highly improbable.

Had petitioner gone to trial, it is extremely unlikely he would have been acquitted and even more improbable that he would have received a more lenient sentence.  Given petitioner's criminal history, if he was found guilty at trial he was going to be sentenced as a persistent violent felony offender and vulnerable to an extremely long sentence.  The plea provided petitioner with a sentence at the lowest end of the mandatory sentencing range, twelve years, and the court noted that, had petitioner gone to trial, he would face a maximum term of twenty-five years to life instead.  Given that counsel's performance was objectively reasonable and that there was no indication that petitioner was prejudiced by taking the plea,

petitioner's claim of ineffective assistance of counsel is meritless.

Petitioner contends that, given the notations in the presentence report and his testimony at the sentencing hearing – that he was unable to recollect most of the day when the victims were assaulted – the court should have waited to impose a sentence to further explore the possibility of an intoxication defense.  Petitioner "is effectively alleging that the trial court should be found at fault because it did not read petitioner's mind. [However], . . . the trial court had no basis on which to question [petitioner's] ability to form the requisite intent . . . ."  *Garfield*, 421 F. Supp. 2d at 613.  As previously discussed, petitioner fully allocuted to the charges in the plea.  Under oath, petitioner voluntarily and knowingly admitted to engaging in the activity alleged, giving the court no reason to suspect that the plea was invalid.  Further, despite his statements in the sentencing hearing, petitioner then acknowledged responsibility and apologized for the actions he took in assaulting the victims.  Therefore, petitioner's contentions are meritless.

Accordingly, the habeas petition is denied and dismissed.

**V.     CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that the petition (Dkt. No. 1) is **DENIED AND DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. §

2253(c)(2) requires;[9] and it is further

    **ORDERED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

    **ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

    **IT IS SO ORDERED**.

Dated: February 6, 2018
      Albany, New York.

Mae A. D'Agostino
U.S. District Judge

---

[9] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).